Good morning, Your Honors. May it please the Court, I'd like to reserve three minutes for rebuttal. Keep track of your own time, please. I will, Your Honor. My name is Dow Patton. I represent Charles Thomas and Lloyd Waite. Mr. Waite is present in the courtroom today. Your Honors, this case presents a question for Mr. Waite, primarily of What is the responsibility of a party seeking summary judgment to produce and not obstruct discovery of evidence upon which it relies to obtain summary judgment? Well, can you clarify for me whether you received the race of city drivers at the Mira Loma facility? Because it seemed to me from your brief and some of the letters flying back and forth, declarations and so forth, that you had received that information prior to opposing summary judgment. That's correct, Your Honor. A portion of that information, the information that we did receive, is the actual written disciplines that were issued correlated with race, but only of those who received those permanent write-up disciplines, not the entire demographics of that workforce. And the problem with that, Your Honor, is we only then had the evidence for statistical purposes of those who had actually received discipline, as opposed to the races of all who worked there, so that we could determine It seems to me there's a factual disagreement between you and your opposing counsel as to whether they did submit to you the demographics of the people in the same category, whatever they are, the drivers, that they gave you the racial composition breakdown and the numbers of employees who held comparable positions. That's not correct? It's not correct, Your Honor. We did not receive the demographics of the entire workforce of that class of drivers. We did not receive the racial makeup of everybody in that class. What we received was the disciplinary documents themselves, and we had to sort through those ourselves to be able to compile that data and present it to the district court to show these remarkable racial disparities. And that gets down to the circumstantial evidence. This is, again, these discrimination and discipline cases. Well, there's a fair chance the case comes down to whether you did receive or didn't receive that information. Your opponent says that you did, that they did give you. I think it was attached to, as an exhibit, to something of a deposition. Your Honor, what was attached to that deposition was a breakdown of particular disciplines, not the entire demographics of that workforce. So just to be clear, that I understand what you're saying is that you received the demographics only as the individuals who were disciplined. That's correct, Your Honor. And you did not receive information as to individuals or drivers who worked at the Mira Loma facility who were not disciplined, and so therefore you couldn't compare to determine whether minorities were targeted. That's correct, Your Honor. What we did was aggregate the data that we did have, which was the actual discipline documents themselves, and go through there and say, let's look at who got disciplined. No, that would not tell you what the other, however other members of the workforce, they were. And as I understand your opponent's position, he says he did supply you with that information, and you say he didn't. That is correct, Your Honor. Is what you got part of the record? Yes, Your Honor. What we did, well, our compilation of a voluminous set of documents served on us the last day of discovery. A lot of this information was dropped on us the very last day of discovery. Well, you delayed a lot of discovery, so. Well, we delayed the discovery, Your Honor, because we were engaged in the meet and confer process, and that meet and confer process, we always have to balance that. Do we run to court immediately? But where is the due diligence on this record? The court basically already granted you an extension so that you can gather the information that you need, and then in the interim, how many months was it between the time the court continued it the first time and then the time the summary judgment was taken up again? There were eight months, Your Honor. All right, so in that eight months, did you ever move to compel for the records that you needed? We did not move to compel, but we engaged in a long meet and confer process that was set forth in the Declaration of Mr. Smith in support of our 56D request that demonstrated that we worked with the opposing counsel to obtain the information, and finally, at the very end of discovery, we did. And the interesting thing about that, Your Honor, is at the very last day of discovery, we're presented with here's all these comparators. Here's some Hispanic and Caucasian individuals who actually received more write-ups than Mr. Wade. But identifying that person on the last day of discovery, how am I going to bring a motion to compel about those individuals or those comparators? Given that in the eight months you failed to move to compel, is that a lack of due diligence? I mean, the district court, with its ginormous docket, has got to have the ability to manage it and move it forward. Absolutely. And having continued it already once and given you substantial time in order to gather the information, why shouldn't we say that's a lack of due diligence? It's not a lack of due diligence, Your Honor, because for two reasons. One, we immediately propounded additional discovery. We sought the 30B6 deposition. We engaged in numerous interrogatories, and we obtained the evidence that we did present to the district court, which we believe, standing on its own, even without the Rule 56D, has very stark racial disparities in how the discipline is being meted out. The 91% of all of the people that are recommended for the final written warning are, in this case, are minorities. Only blacks and Hispanics were recommended for termination. But these types of statistics, when you add those along with the direct statement, although it's not a direct statement of direct racial animus, the statement of, I could write up 12 guys a day for this stuff, Lloyd, but I choose to write up you. The district court resolved the inferences from that statement simply to say that Mr. Link had the ability to, some discretion as to whether to write people up. If that were resolved in Mr. Waite's favor, I can write up 12 guys a day, but I choose to write you up, Lloyd. Along with the intense disciplinary record for African Americans in the Mira Loma facility, that is sufficient and substantial evidence of pretext. I don't know whether it's excessive for African Americans or Hispanics without knowing the composition of the workforce. And I don't know whether it's any different than the rate for other races. Well, Your Honor, and if we look at the, going back to the Rule 56D question, and the diligence that plaintiffs engaged in in trying to obtain this evidence, the record is very clear that we met and conferred with opposing counsel, and opposing counsel said we're going to give you this information. We're going to give you this information. We're not going to, we don't have the underlying data, so we're not going to give you the underlying data that shows whether people are delivering things on time or not. But what we are going to do is give you the disciplines, and we're going to correlate the races. When did they say that? They said that. When did you ask for it? We asked for it within that last eight months, Your Honor. Within the last eight months? Yes, Your Honor. After we received, after the district court allowed us more time to go get that information. I'd like to move on to Charles Thomas. Yes, go ahead. The question presented in Mr. Thomas' case, and it can kind of be viewed one way or the other, whether you allow leave to amend to put in a statutory basis, a specific statutory basis for a Tammany claim, or whether simply the Tammany claim was wrongly decided by the court below because it wasn't the actual code sections of California Labor Code 1102.5 and 63010 were not pled in the original complaint. We've cited cases, the Green v. Raley case and the Paris-Falcon case, that indicate that the way the California Supreme Court looks at pleading Tammany cases is that you have to plead what the facts are, what's going on here. Well, in this case, we originally pled an STAA claim for Mr. Thomas, Surface Transportation Accountability Act. And that contained some of the protected disclosures that Mr. Thomas had made. That claim was dismissed based on administrative exhaustion issues. And after we obtained some initial discovery, including the emails that were there, that showed that Mr. Thomas not only made these disclosures about a wide variety of violations that were going on there, but he refused to participate. And under the earlier version of 1102.5, and it has been recently amended, under the earlier version of 1102.5, if you refuse to participate, you're not required to go to obtain the protections of 1102.5. You're not required to go to law enforcement. You're simply required to demonstrate causation. But the adverse action, which is clear in that case, termination, that followed closely on his disclosures within a few weeks, was related. We offered substantial and specific evidence there because it was the changing explanations for the termination. First, the testimony was it's because he made complaints back to the national headquarters in Florida. Then they came up with this code of conduct violation or a security breach. Those were never in the contemporary misdocuments. Because in this case, you did blow the scheduling order deadline. There has to be good cause. What's the good cause that's shown in the record? The good cause in the record is the last day there were facts that appeared after the last day to amend, which was the date of the case management conference. So we hadn't engaged in any discovery at that time. As soon as we found those facts, as soon as we found the e-mails that showed that Mr. Thomas had refused to participate in the illegal conduct, that is when we moved to amend and include an 1102.5 claim. This was early on in the case. This was more than a year before the case was finally over. Then at summary judgment, we said the Tammany claim is based on public policy, and that public policy is 1102.5 and 6310. The evidence bore that out in discovery. We believe that that was error. I'll reserve another two minutes. Thank you. Good afternoon. May it please the Court. My name is Jared Bryan. I represent defendant and appellant FedEx Freight. Counsel, to start with a question, did you or did you not supply opposing counsel with the composition, the demographic composition of the workforce in this category? Unequivocally, yes, Your Honor. Pardon me? Unequivocally, we did. Where is it in the record? Well, so it's hard for me to tell exactly where Interrogatory 21 is because I don't see the— Well, you've had a whole lot of time to prepare for this case, and this is a linchpin of your argument. Where is the what you produce that covers what he says? The reference is to Interrogatory 21, and it doesn't seem to correspond with the record under the citation that counsel has given. But Interrogatory 21 was served on May 22, 2013. Yes. The deadline for discovery was June 21, 2013. That's fine, but you say you gave it to him. Correct. And what form was it? In response to an interrogatory. What form? In response to Interrogatory 21. So you gave a response, and you can't find your Interrogatory 21 response? I certainly can. I believe it's referenced in the record, but it's not in the correct spot. Counsel, you heard the questions at the beginning. You couldn't have looked it up while you were waiting to get on? As I mentioned, I looked at the reference that is in the record or is in the brief, and it does not correspond to the record. Well, how are we supposed to find and resolve this dispute? Well, that's the trouble. The fact of the matter is that the interrogatory was not served. It was served in violation of the scheduling order. No, wait. What has that got to do with anything? You said you gave it. You just said you answered that interrogatory. We did. We absolutely did. All right. Well, where can we find the answer to the interrogatory that will contain the information? I can find that in the record, Your Honor. It would take me a few minutes to do so, but it is in response, as I say, to interrogatory 21, which was served at the very end. Well, if it takes you a few minutes, why didn't you do it? You heard us ask about it. During the time that I had, I was unable to find it. As I say, it did not correspond. I found the reference in the brief, but it does not correspond to the record. It appears that what was submitted is off. You can find it, and then you can send it to us. Is that right? Okay. I'd be happy to do that. Your Honor, the It was a written response, or did you actually produce something separate attached to an interrogatory, like a spreadsheet that basically lays out the race of all of the workers at Mira Loma? Yes, Your Honor. I'd be happy to explain that. So the problem here was there was no request for these items until the very end. Judge Fisher's scheduling order specifically said you need to serve these things well in advance of the cutoff date so that any disputes can be resolved by way of motion. What happened here is that those items were requested at the very tail end of discovery, after the first continuance in those eight months that were talked about. Here, not only did the FedEx go to great lengths to provide that information, but they did so in various formats. They gave all of the corrective actions for all of the P&D drivers or the CD drivers, even though that was arguably not That's not what we're asking about, the corrective actions. We're asking about the entire workforce in this job category under the supervisor. Yes, Your Honor. That's the comparator, right? Correct. And that was provided in response to both a PMK deposition. We went to great lengths to compile evidence with all of the listings of the races of the P&D drivers. Subsequently, counsel made a request via interrogatory, interrogatory 21 that I referenced, on the 22nd of May, making a deal on June 21st. We, in good faith, responded, even though that was violative of the scheduling order, and provided information. Don't tell us irrelevant things. We're trying to see the thing you responded to. I don't care whether it was a Saturday, a Sunday, in violation of anything. I just want to find out where we can see it. Right. And so what was provided was, in the PMK deposition, we provided all of the races of the P&D drivers. With regard to the interrogatory response, it said, there are only five individuals for whom there are no corrective actions, and here are their races. None of them were African American. So, okay. Let me make sure that I understand the record from your perspective. PMK deposition, you gave them the information regarding the race of not just individuals who received corrective action, but individuals who did not receive corrective action as well. At the PMK deposition, in response to the request that was made, we gave them all of the corrective actions and the races of those individuals. But not the ones who did not receive corrective action. That was not requested. All right. So now, we get the summary judgment the first time around. They didn't have the information to oppose. They asked for continuance. That was granted. And then in the eight-month interim, at the tail end of that, I'm trying to understand factually what you're representing at any point. If I'm not correct in the sequence of events, let me know that. But at the end of that eight-month period, they did ask for the races of individuals who did not receive corrective action. And we don't care when it was, but you turned it over. Yes. And that is interrogatory 21. Right. That is in our record that you can't find, or is not in our record, and you are going to supplement. It is in the record. And so the response to that interrogatory was, please see what we've already given you, all of the races for those people, and there are five people for whom there are no corrective actions. Here are their races. That gives you the totality of the races of all the individuals. So the entire workforce, everybody's gotten a corrective action, with the exception of five people. Exactly. So based on that information, it was very easy for them to derive what the information, what the composition of the workforce was with regard to the city drivers. Even with that information, they failed to do so. And, again, I go back to the timing of that, because there was no time for any resolution via discovery motion. They did that very tail-end. The ones who received disciplinary action, as I recall, there was one white member of the workforce, three black members, and was it about 19 or 16 Hispanics? We're talking about dozens and dozens of drivers, Your Honor. I thought we were talking about this category of pickup and delivery drivers or city drivers. Correct. All at one particular location. And that numbered many dozens of drivers for whom we provided all of the corrective actions, and not only that, but also the underlying documents upon which those were based, and the races of all of those individuals. Okay. Well, you will submit us, as Judge Fischer requested, with the information you provided, and tell us where it is in the record. Very well, Your Honor. I'd like to move on, then, to some of the other points with regard to Mr. Waite. We'd like to have that within a week. Okay. Very good. With regard to Mr. Waite, it's very important to remember that there's a shifting burden here with regard to Mr. Waite. He has to show, first, a prima facie case. He does not dispute that there were legitimate non-discriminatory reasons for the actions taken. In fact, if anything, what we have here is a case of extreme, it's a pretty extreme case, really, of fairness, forbearance with regard to the conduct that Mr. Waite engaged in. He acknowledges that he did not receive any discipline of any kind, even though he engaged in some pretty egregious conduct, including smashing a coffee cup that splashed coffee on his supervisor, then smashing a wall with his hand and kicking a cone. So the opposite of discrimination is what we really have going on here. Mr. Waite has offered no pretext, or no admissible evidence to establish any pretext to show that there was actual intentional discrimination going on here. With regard to Mr. Thomas, there's several different reasons as to why his claims must fail, primarily because his entire theory and claim changed at the very end, even without getting leave to amend from the court to do so. He had moved previously, untimely, I might add, with regard to the 1102.5 claim. That would have been futile anyway, for many reasons that we addressed in the court below, and that opposing counsel failed to respond to. With regard to the 6310 claim, no motion was ever made for leave to amend as to that claim. It simply was brought up in response to a motion for summary judgment. Even if you were to consider those claims, they fail for various reasons. At that time, it's important to note that as of January 1, 2014, those statutes changed dramatically. Prior to that time, it was clear that you needed to exhaust administrative remedies. With regard to filing a complaint with the labor commissioner, he did not do so. There's nothing in the record that suggests that happened. After January 1, 2014, that would be a different story, but there was no exhaustion of administrative remedies. Similarly, there was no leave to amend within any kind of statutory period. It waited much too long to do that. As such, the claim was barred even if it had gone forward. With regard to the substantive claims anyway, Mr. Thomas has not made any showing on this record that he engaged in any protected activities. Instead, what he said was at deposition that he forwarded a package of documents to a gentleman named Jeff Baker for the purpose of addressing a customer service issue, that he was concerned that the delivery times did not correspond to when people were actually getting their freight. He testified that that was the extent of why he was concerned about those documents. With regard to... He also never suggested in any event or put forth any information or evidence that he refused to engage in any illegal activities. Again, that was something that was never litigated at any point. Not only did he amend or to change dramatically his legal theory, but he also added in a completely new fact, which was that he had refused to engage in illegal activity. That's something we never saw at any point in the case. In sum, there simply were no genuine issues put forth on this record, no issue of pretext, and Mr. Thomas' claims are also barred for the various reasons that I've articulated. All right. Thank you, Counsel. Thank you. Counsel, let me try to see if we have this problem on the figures correct. There were 19 Hispanic, 3 black, and 1 white person who received what? I believe those are final written warnings. All right, final written warnings. They were all what you call either city drivers or pickup and delivery drivers. Those are synonymous, Your Honor. All right. And the comparative figure that you wanted was the total number of employees, pickup and delivery drivers at that same location? Correct. It was approximately 100 or 105 during the time period in question. All right. And you say you never got the breakdown of that 100 or 105? No. The interrogatory response that Counsel is referring to is a parsed interrogatory response saying, not I'm going to give you the demographics of this workforce, but I'm going to tell you the races of the individuals for whom there exists no record of discipline. And this is a key issue for us because the discretion of the supervisor in making a record or not making a record is a key portion of this case. Right, but that's why Counsel is saying he gave you everything, because he identified individuals for whom no corrective action was reflected in their files. And then at the PMK, in connection with the deposition, he gave you individuals who received corrective action. So you put together, that should be the whole workforce. And that's key, Your Honor. Receiving a corrective action and having it stay in your file are two very different things. And this has been in the language that was parsed throughout this entirety, is they will lay out plenty of corrective actions, but only some of them make them into the files. And if we look at the ones that go back and make it into the permanent records that are stamped received at headquarters, it dwarfs the African-American corrective actions that get stamped as well. It dwarfs any Hispanics or Caucasians. We pointed that out in the briefing. And this is key. The parsing of this language, somebody can receive a corrective action. I'm going to write it up, but then I'm going to throw it away. And then what stays in the file and becomes the basis for adverse action. And very briefly on adverse action, Your Honors. The ones that stay in the file are the 19, the 3, and the 1, right? Yes, Your Honor. And you want to compare that to, A, either the total workforce or the total workforce who may have received, well, does it matter whether they have received them and were thrown away? Only 19, 3, and 1 received a type of adverse consequence that your client did compared to a workforce of X. 105, yes, Your Honor. So that would show you whether there was something disproportionate. Yes, Your Honor. All right. And did you get that information of what the breakdown of the 105 were? No, Your Honor. We got a simple statement of these are the only people for whom there is no record of a corrective action in their file, as opposed to give me the demographics so that we can compare it against. No, when you got these are the only people, were those the only people identified by demographics, by race? They did identify by race, Your Honor. So you did have the comparison of the numbers in the workforce by race as opposed to the numbers who received the written warnings that remained in the file? Correct, but not the ones that didn't receive them in the file, Your Honor. Or that didn't stay in the file. I'm sorry, not the ones who received corrective actions, but they didn't stay in the files. That's the key. If you receive a corrective action, but it doesn't remain in the file, that's the subjective type of discrimination that's particularly invidious. And we've demonstrated in the record that this facility had that type of discretion given to these people, and it's articulated in the words of Mark Link. I can write up 12 people a day, but I choose to write you up, Lloyd. Did he say Boyd? Lloyd, I'm sorry. Lloyd is Mr. Waite's first name. And just very briefly, there is adverse action. It was suspension. He was suspended, and there's testimony as to what that suspension does on his ability to transfer and promote. Thank you, Your Honors. Thank you, counsel. I'm going to ask opposing counsel one more, so we get clear on the figures. Counsel, I think now just said he had the total figures by race of the employees in the unit. Correct, Your Honor. All right. Now, he says it's relevant to his case that there be, in addition to that, the number of people in the unit by race who did receive written warnings which were thrown away. Are you aware of that? Yes. There's absolutely no evidence for that in the record anywhere about this distinction between whether it was in Lakeland or not. All of the corrective actions were straight out of these employees' personnel files. You can search anywhere in the record. You're not going to find anything that suggests that there's some difference. That's just something that was completely out of left field in an opposition to summary judgment with no testimony or evidence of any kind. There's just simply no distinction between whether it had a particular stamp or not. All of those things came directly out of the employees' personnel files. You're saying there is no category of people who were written up but the warnings were thrown away? Correct. There's absolutely no evidence in this record about any of that. There was no Mr. The supervisors were deposed. That was never even asked, let alone any evidence being brought forward about some distinction between having a file stamp saying Lakeland. All of those corrective actions came directly from the personnel files. What does Lakeland mean? Lakeland is the corporate office. We have no idea what the circumstances of whether someone stamped it or didn't stamp it or why or what the significance of that would be on this record. Any written inquiry made as to that? Nothing. Nothing of any kind. Okay. Thank you. You're very welcome. Counsel, I want to ask you, did you make a specific request in an interrogatory for the numbers to people who received warnings that did not make it into the final file? We did not, Your Honor, because we only understood that difference to be there and necessary based on the parsed language of the response to the interrogatory. And then we looked at the documents themselves, and some of the documents bear stamps that they are received at corporate headquarters. And we went through, and we went through every single one of these thousands of pages of documents, and we identified the ones that went back to headquarters. And the ones that went back to headquarters, almost only African Americans ones go back to headquarters. And that raises a question. Why? Why is that? Is that at the end of discovery after I've, when the defense doesn't produce the documents until the very end of the case, and admittedly I have to go back and ask questions of witnesses and then frame interrogatories that seek further information. When you parse an answer and say, an answer to an interrogatory and say, the These individuals have no records of corrective actions. As opposed to, here's the demographics. These people never received a written warning, a final warning, et cetera. Why does it have to be parsed in that fashion? That then, that's when the question arises, Your Honor, is if you parse it in that fashion, it's because, and there's an inference to be drawn here. If you're going to parse it in that fashion, it's because there's something else there. It's because the discretion that there is that testimony in the record of the discretion of these supervisors, whether to include those corrective actions in the files or not, because they form a progressive sort of discipline. Thank you, counsel. Thank you, Your Honor. The case is adjourned. It will be submitted.
judges: Reinhardt, Fisher, Nguyen